IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JOSHUA ORSINGHER HENSON                                    PLAINTIFF

v.                          Civil No. 5:21-cv-05214

DEPUTY C. FOSTER;
NURSE JESSE PRINCE; and
NURSE SHAWNA STEPHENS                                    DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed *pro se* by Plaintiff, Joshua Orsingher Henson, pursuant to 42 U.S.C. § 1983.   Plaintiff names three defendants – Deputy C. Foster, Nurse Jesse Prince, and Nurse Shawna Stephens – and alleges these Defendants denied and/or delayed his medical care and are liable in both their individual and official capacities.   Before the Court is a Motion for Summary Judgment filed by Defendant Foster (ECF No. 16), and a Joint Motion for Summary Judgment filed by the Nurse Defendants Prince and Stephens.  (ECF No. 19).  Plaintiff has filed a Response (ECF No. 23), and a Supplemental Response (ECF No. 33).  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3) (2011), the Honorable P.K. Holmes, III, United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation.

## I. FACTUAL BACKROUND

Plaintiff is currently incarcerated in the Benton County Detention Center ("BCDC").  His claims in this action arise from an earlier incarceration in the BCDC during July 2019; at that time, Plaintiff was a pre-trial detainee.  At all times relevant to the instant lawsuit, Defendant Deputy C. Foster was a deputy with the BCDC. The Nurse Defendants – Jesse Prince and Shawna Stephens

1

– were nurses employed with Turn Key Medical ("Turn Key"), a company who contracts to provide medical services to the BCDC.

Plaintiff was booked into the BCDC on July 3, 2019, on charges of possession of drug paraphernalia, possession of a controlled substance, and a felony parole violation. (ECF No. 18-2). It does not appear Plaintiff was experiencing any medical problems at the time of his booking. (ECF No. 18-7, p. 6). On July 6, 2019, Plaintiff reported rib pain and Nurse Angie Lemas ("Lemas," who is not a party to this litigation) recorded Plaintiff's pain level as a 2/10. (ECF No. 18-4, p. 1). Plaintiff disputes the pain level recorded by Nurse Lemas, claiming he reported his pain as much higher but cannot control what Lemas wrote down. (ECF No. 23, p. 1). Plaintiff was assessed by Lemas, who prescribed Naproxen twice daily for his pain. *Id.* at 3; (ECF No. 19-6, p.2). During this visit on July 6th, Plaintiff did not complain of head or neck pain, (ECF No. 19-1, pp. 3-4), and Plaintiff's vital signs were within normal limits during this visit. (ECF No. 19-1, p. 66; 19-5, p. 3; ECF No. 19-6, pp. 2-3).

Between July 6 and July 10, 2019, Plaintiff received his prescribed Naproxen twice daily except for one occasion on July 7, 2019, when he did not line up for "med pass." (ECF No. 19-1, p. 32). Defendant Nurse Prince's only involvement with Plaintiff's medical care during this time was to distribute Naproxen to him on July 8-9, 2019, and "check in" his medication from the pharmacy. *Id.* at 32; (ECF No. 19-5, p. 2). Plaintiff testified in his deposition that Defendant Nurse Prince also conducted his July 6th visit; (ECF No. 19-3, p. 23); however, all medical records indicate it was Nurse Lemas that conducted the July 6th nurse call visit. (ECF No. 19-1).

On July 11, 2019, at 1:56 a.m., Plaintiff's medical records indicate Nurse Nadia Malapha (who is similarly not a party to this litigation) assessed Plaintiff for complaints of allergies and all-over body pain at a pain level of 8/10. (ECF No. 19-1, p. 4). The nursing record for this visit

2

includes the following prompt: "Inmate Complaint/What Additional Information Has the Inmate Provided?" to which Nurse Malapha responded: "withdrawing."  *Id*. at 5.  Additionally, Nurse Malapha noted "withdrawing from heroin" in response to: "If Intoxication/Withdrawal Symptoms, Specify."  Finally, under "Condition Improved By," Nurse Malapha noted "detox protocol."  *Id*.  Nurse Malapha contacted Dr. Saez, and reported both Plaintiff's symptoms and Plaintiff's self-reported history of heroin use.  Dr. Saez ordered Nurse Malapha to implement opioid withdrawal protocols for Plaintiff which included the prescription of Bentyl, Imodium, Robaxin, Phenergan, and Clonidine.  *Id*.; (ECF No. 19-6, p. 2).  Plaintiff received these medications twice a day between July 11 and July 16, 2019.  (ECF No. 19-1, pp. 32-34).  Nurse Malapha recorded Plaintiff's vital signs from this assessment:  blood pressure 122/75, pulse 80, respirations 18, and oxygen saturation 99%.  (ECF No. 19-1, pp. 65-66).

On the same day at 4:58 am, Nurse Nadia Malapha entered a note on Plaintiff's medical file stating:

> Called down to Dpod, patient complaint of severe pain all over body due to detoxing.  Patient understands he has been started on detox meds.  Vitals 128/78 p. 68 O2SAT 99% RA.  Will continue to monitor for any changes.

(ECF No. 18-4, p. 10).  Plaintiff does not dispute that Nurse Malapha and/or Dr. Raez believed he was suffering from withdrawals, or contend that he challenged Nurse Malapha's belief that he was suffering heroin withdrawals.  Instead, Plaintiff simply disputes he was detoxing or that he was showing signs of detoxing.  (ECF No. 23, p. 3).  Later the same day – July 11 – Plaintiff was taken to the nurses' station by the deputies on duty sometime between 9:00 a.m. and 2:00 p.m.  Non-party Nurse Francesca Kriegbaum entered a note on Plaintiff's chart regarding this visit:

> Patient brought into nurses' station by deputies.  Patient reporting 10/10 pain, stating this is 'the worst pain I've ever felt.'  Patient stated 'the pain just keeps coming and gets worse and worse and worse.'  Patient provided with a one-time does of Tylenol.  Patient stating

'I can barely walk,' patient very dramatic in nurses' station, VS all WNL, patient ambulated back to pod without assistance.  Patient added to doctor call for c/o pain.

*Id.*

Plaintiff believes it was Defendants Prince and Stephens that assessed and treated him on July 11, 2019.  (ECF No. 19-3, p. 24).  All medical records indicate it was non-party nurses as stated herein, and Plaintiff did not dispute these records in his Responses.

On July 12, 2019, the deputies on duty called the nurse on duty to evaluate Plaintiff because he was in severe pain and could not move his neck and back.  (ECF No. 18-7, p. 8).  At 2:33 am, non-party nurse Shelley Katherine entered the following note on Plaintiff's medical file:

> 0030 called by deputies stating i/m is requesting Tylenol stating he is in the worst pain of his life.  This nurse informed deputies he is already on multiple different medications for pain and he will have to put in a sick call for tomorrow.  0045 called by deputies stating i/m is saying it is an emergency he cannot move his neck and his back is in severe pain. I/m sitting in chair at pod control and says he needs to go to the hospital now.  This nurse asked why, he states 'This is the worse pain I have ever had in my life.'  This nurse explained that he is already on different medications for pain.  I/m states they are not helping.  BP 142/85 P85 O299 on RA.  No abnormalities noted on neck or spin visually. I/m states he is already on the list for tomorrow.  I informed i/m I will give him a 1 time does of Tylenol, but no new orders will be placed until he sees doc tomorrow.

(ECF No. 18-4, p. 10).  Nurse Kriegbaum scheduled Plaintiff a sick call for neck and back pain, and Plaintiff was seen by non-party Dr. Roberto Saez on the same day (July 12).  (ECF No. 18-4, pp. 2, 8).

During his evaluation, Dr. Saez noted Plaintiff's neck was normal; he had no rash; his chest sounds were normal with no audible wheezes; and his vital signs had remained within normal limits.  (ECF No. 19-6, p. 3).  Dr. Saez did not suspect Plaintiff suffered from bacterial meningitis, but he could not identify the exact cause of Plaintiff's chest pains, so he ordered a chest x-ray and labs.  *Id.*  Dr. Saez prescribed Plaintiff Prednisone and Tylenol during this visit.  *Id.*  Dr. Saez did not believe Plaintiff's conditions warranted transfer to the emergency room on July 12th as his

condition was stable remained consistent with opioid withdrawals.  *Id.*

Defendant Nurse Stephens scheduled Plaintiff's labs for July 15, 2019.  (ECF No. 19-1, p. 40).  According to Dr. Saez, it was reasonable and appropriate for Defendant Stephens to wait until July 15, 2019, to draw Plaintiff's blood for the ordered lab work.  (ECF No. 19-6, p. 3).  Plaintiff did not submit any sick call requests between July 12 and July 16, 2019.  *Id.*  However, on July 15, 2019, at 1:31 a.m. Nurse Malapha noted she was called to Plaintiff's pod because deputies stated Plaintiff was having hallucinations.  (ECF No. 19-1, p. 39-40).  Nurse Malapha scheduled Plaintiff for an Urgent Referral to see a mental health professional as a result of this encounter. *Id*.

Plaintiff's lab work was performed on July 15, 2019, and based on the results, Dr. Saez ordered Plaintiff to the emergency room on July 16.  *Id.* at 9-10.  Plaintiff was admitted to Mercy Hospital Northwest Arkansas ("Mercy Hospital) on the same day.  (ECF No. 18-8, p. 3).

The emergency room doctor at Mercy Hospital made the following notes on July 16, 2019:

> 34-year-old Caucasian male inmate presents today for evaluation for some increased confusion as well as abnormal lab work which was apparently obtained there at the detention facility today.  The patient has a known history of hepatitis C which is chronic.  Apparently the patient smokes also.  The officer who is accompanying the patient today says that the patient apparently had been somewhat ill feeling and seemed to have some intermittent hallucinations and was evaluated at the health care station there at the detention center.  He was somewhat pale and appeared to be seeing things that were not there and lab work was obtained.  Apparently the patient had a very elevated white blood cell count and so he was sent here for further evaluation.  The patient says that he feels somewhat ill but seems to be easily distracted and occasionally fidgets with his hand.  When I had asked the patient what was in his hand he said he had just had a candy wrapper in there but continues to be somewhat tremulous.  The officer is at the bedside and says the patient apparently had said that he had a pair of scissors and the officer says they were not apparent and feels the patient may be having some degree of hallucinations.  This patient says that he may very well have some hallucinations.  The patient denies any illicit drug use.

(ECF No. 33, p. 15).

After testing at the emergency room, Plaintiff was diagnosed with bacterial meningitis on

July 16, 2019.  The note from the admitting physician states:

> Joshua O Henson is a 34 y.o. Caucasian male with past medical history of IV drug use and
> hepatitis C who presents for evaluation of altered mental status and elevated white blood
> cell count.  Patient is currently incarcerated and has been in jail for the last 14 days.
> Appears due to drug charges and IV drug use.  Facility states patient has becoming more
> increasingly confused over the last day or 2 and when they obtain labs today his white
> blood cell count was elevated so they wanted to have this further evaluated.  Initial work-
> up was unremarkable and finally LP was done that showed significant signs of bacterial
> meningitis as the fluid was almost puslike material.  Cell count confirmed the patient had
> bacterial meningitis and we are called for further admission.  By time I got down to patient
> he is becoming less responsive and went into respiratory failure.  He is sitting in the 80s
> on a nonrebreather and we ultimately intubated patient for airway protection.  I was not
> able to talk to the patient by the time I got down to him so all information came from the
> jail or ER provider.

(ECF No. 18-8, p. 5).  Plaintiff was hospitalized in Mercy Hospital Northwest's Intensive Care

Unit until July 29, 2019, and then he was discharged to a separate facility swing bed unit on July

30, 2019.  *Id.* at 2-4. It is unclear how long Plaintiff remained at the second facility; however,

Plaintiff did recover from the bacterial meningitis. (ECF No. 19-3, p. 16). Plaintiff's medical

records from the BCDC suggest he was once again incarcerated at the BCDC as of October 14,

2019. (ECF No. 19-1, p. 6).

Dr. Saez stated in his affidavit that symptoms of bacterial meningitis include a painful and

stiff neck with limited range of motion, headaches, high fever, confusion or lethargy, rash,

vomiting, and light sensitivity. (ECF No. 19-6, p. 2). Dr. Saez notes that symptoms of opioid

withdrawal similarly include severe body aches, chills, fever, headaches, and alterations in

cognitive status such as hallucinations.  *Id.*  Dr. Saez stated that, based upon Plaintiff's symptoms

along with his self-reported medical history, it was reasonable to diagnose and treat him for opioid

withdrawals in the absence of a fever, rash, abnormal vital signs, or abnormal lab results.  *Id.*  Dr.

Saez noted, Plaintiff's vitals were always within normal range and did not indicate any more

serious underlying medical condition beyond opioid withdrawals.  (ECF No. 19-6, pp.2-3).  Dr.

6

Saez stated he never suspected Plaintiff was suffering from anything other than opioid withdrawal until he received Plaintiff's abnormal lab results on July 16, 2019.  *Id.* at 4.

While Plaintiff did not directly dispute Dr. Raez's affidavit in his Responses, Plaintiff does dispute whether he was in fact suffering from opioid withdrawal.  (ECF Nos. 23, 33).  Plaintiff relies upon his drug screening from the Mercy Hospital emergency room as support for his contention that he was never detoxing or suffering from withdrawal symptoms during this time. (ECF No. 33, p. 10).

Defendant Nurse Prince stated in her affidavit that her only involvement in Plaintiff's medical care was on July 8, 9, 15 and 16 when she administered prescription medication to Plaintiff, and on July 10, 2019, when she "checked in" Plaintiff's prescription medication from the pharmacy. (ECF No. 19-5, pp. 2-3).  Defendant Nurse Prince thus contends she was not involved in Plaintiff's care or assessment on July 11, 2019.  *Id.* at 3.  Plaintiff did not dispute Prince's affidavit but again disputes the characterization that he was suffering from opioid withdrawal. (ECF Nos. 23, 33).

## II. PROCEDURAL BACKGROUND

Plaintiff filed his Complaint on December 1, 2021.  (ECF No. 1).  Defendant C. Foster answered on January 26, 2022 (ECF No. 10), and Defendants Prince and Stephens answered on March 14, 2022 (ECF No. 13).   In his Complaint, Plaintiff alleges Defendants each denied him proper medical care by accusing him of lying about his symptoms and sending him back to his pod without any medical care.  (ECF No. 1, pp. 4-5).  Plaintiff specifically alleges he almost died of meningitis because of the Defendants' negligent delay in providing medical care.  *Id.*  Plaintiff also asserts he suffered a swollen brain, a coma, collapsed and scarred lungs, and spinal injuries as a result of Defendants' actions.  *Id.*

Plaintiff asserts both official and individual capacity claims against Defendants. *Id.* at 5. When asked to describe the custom, policy, or widespread practice that Plaintiff believes caused the violation to his constitutional rights: Plaintiff alleged he was not allowed to see a doctor, and no actions were taken due to the nurses' inexperience. *Id.*

Plaintiff requests $750,000.00 in damages for physical pain, suffering, and medical cost; $1,000,000.00 in damages for punitive damages for malpractice and negligence; and $250,000.00 in damages for mental anguish, abuse, and post-traumatic stress syndrome. *Id.* at 9.[1]

On September 6, 2022, Defendant Foster filed his Motion for Summary Judgment (ECF No. 16), Statement of Indisputable Facts (ECF No. 18), and Memorandum Brief in support of his Motion for Summary Judgment (ECF No. 17). Defendant Foster argues he is entitled to summary judgment as a matter of law because: (1) there are no genuine disputes as to material facts; (2) Defendant Foster was not deliberately indifferent to Plaintiff's serious medical needs; (3) verbal comments or threats fail to rise to the level of a constitutional violation; (4) Defendant Foster is entitled to qualified immunity; and (5) there is no basis for official capacity/county liability. (ECF No. 16).

On the same day, Defendants Prince and Stephens filed a joint Motion for Summary Judgment. (ECF No. 19), with Statement of Undisputed Facts (ECF No. 20) and Memorandum Brief in support of Joint Motion for Summary Judgment (ECF No. 21). Defendants Prince and Stephens argue: (1) Defendant Stephens and Prince are not the nurses responsible for the actions/inactions which Plaintiff challenges; (2) Defendants Stephens and Prince, and Turn Key

---

[1] Plaintiff made an additional claim and request for damages in the Complaint against Meghan Rutledge for improper charges for medical services. (ECF No. 1, pp. 6, 9). These claims were dismissed at the screening stage pursuant to 28 U.S.C. § 1915(a). (ECF Nos. 6, 9).

were not deliberately indifferent to Plaintiff's medical needs; and (3) there are no material facts in dispute which preclude summary judgment.  (ECF No. 19).

Plaintiff filed a verified Response on September 19, 2022.  (ECF No. 23).  In his Response, Plaintiff does not indicate which Motion or set of facts he is disputing, but he does list them by number.  Plaintiff disputes #3, #5, #6, and #33.  Based on the substance of his disputes, the Court determined that Plaintiff is disputing Defendant Foster's Statement of Indisputable Material Fact ("SIMF") #3, #5, #6, #33.

Defendant Foster states in his SIMF #3:

On July 6, 2019, Plaintiff complained of right-side rib pain during a nursing protocol, indicating the pain was a 2 on a 1-10 scale, and asked for an extra mat.

(ECF No. 18, p. 1).  Plaintiff responded that he disputes this fact because he stated his pain was higher during that exam, but he has "no control what the Nurse does with her pen."  (ECF No. 23, p. 1).

Next Plaintiff disputes Defendant Foster's SIMF #5.  This SIMF states: "Between July 10th at 5:00 am and July 12th at 5:00pm, Defendant Foster was not on shift."  Plaintiff argues these shift logs do not prove that Defendant Foster did not say the statements Plaintiff alleges he said to the Nurses.  (ECF No. 23, p. 1-2).

Plaintiff next disputes Defendant Foster's SIMF #6.  This SIMF states:

On July 11, 2019, at 4:58 am, Nadia Malapha submitted a note on Plaintiff's chart, stating: Called down to Dpod, patient complaint of severe pain all over body due to detoxing. Patient understands he has been started on detox meds.  Vitals 128/78 p. 68 O2SAT 99% RA.  Will continue to monitor for any changes.

(ECF No. 18, pp. 1-2).  Plaintiff disputes the fact he was detoxing, and contends if he had been properly monitored it would have been obvious he was not detoxing but was sick with meningitis.

(ECF No. 23, p. 3).

Plaintiff's last specific SIMF dispute is of Defendant Foster's SIMF #33 which is Benton

County Jail Policy Number G-13(I) stating:

> In order to provide inmates with an opportunity to communicate their health care needs to qualified personal, a sick call system has been developed and implemented at the jail to ensure that all inmate requests for health care are documented and referred to medical staff in a timely and efficient manner.

(ECF No. 18, p. 6). Plaintiff disputes this Policy by arguing he did not receive a qualified person to provide him medical care. (ECF No. 23, pp. 3-4).

Plaintiff also argues that Defendants do not keep accurate records as billing medical history

for another inmate, Michael Hoffman, were included within documents they sent him. The Court

has reviewed all exhibits and attachments to both Motions for Summary Judgment and cannot

locate any medical billing records for Michael Hoffman.

Plaintiff then shifts his response to Defendants Stephens and Prince's Joint Motion for

Summary Judgment. Plaintiff argues the medical professionals did not acknowledge his serious

problems, and they should have known his complaints were serious because even the deputies

could clearly see something serious was wrong with Plaintiff. (ECF No. 23, p. 6).

Plaintiff then argues that his evidence illustrates Defendants had knowledge of his sickness

but ignored it. (ECF No. 23, p. 7). Plaintiff further contends the evidence shows he was treated

differently based on what Defendant Foster stated, and this evidence is in Plaintiff's medical file.

(ECF No. 23, p. 7). Lastly, Plaintiff states that his factual support is in his medical records.

Plaintiff goes on to argue his medical records show that Defendants are all responsible, and Benton

County procedures were not followed, thus, violating his rights. (ECF No. 23, p. 9). The Court

notes, however, Plaintiff did not attach any medical records or his jail file to his Response in

support of this argument.

10

On November 3, 2022, the Court erroneously entered a Report and Recommendation recommending Plaintiff's case be dismissed for failure to prosecute. (ECF No. 26). Plaintiff objected, (ECF No. 28), and Judge Holmes correctly declined to adopt the Report and Recommendation, referring the case back to the undersigned for further consideration. (ECF No. 29). Plaintiff filed a Motion to Extend his time to respond to Defendants' Motions for Summary Judgment, (ECF No. 27), requesting additional time to supplement his Response with his medical records from Mercy Hospital and Gravette Medical Center Hospital. *Id.* The Court granted Plaintiff this extension. (ECF No. 30).

Plaintiff filed his Supplement on December 29, 2022, (ECF No. 33), arguing his hospital records from Mercy Hospital – where he was hospitalized after his incarceration in the BCDC – prove Defendants did not properly care for him. He argues that if he had been properly treated during the fourteen days he was incarcerated in the BCDC, he would have avoided the life-threatening trauma with brain swelling and permanent injuries he suffered.[2] (ECF No. 33, p. 1). Plaintiff further contends these hospital records illustrate the medical malpractice and incompetence of Nurse Defendants Stephens and Prince. *Id.* at 2. Finally, Plaintiff argues the procedures at the BCDC are established as lacking by the fact that a mailing from the Court was returned even though Plaintiff remained incarcerated at the facility. *Id.* at 3.

The Mercy Hospital Northwest Arkansas medical records attached to Plaintiff's Supplement include fourteen pages of medical records which Plaintiff has written notes and bracketed around particular sections to direct the Court's attention to these sections. First, Plaintiff bracketed sections of assessment notes from his Mercy Hospital doctors on July 16, 2019. This

---

[2] Plaintiff alleges he suffers from permanent injuries of lung scarring and PTSD. However, there is no evidence on the record to indicate Plaintiff has been diagnosed with permanent lung scarring or PTSD.

section indicates Plaintiff's diagnosis with "bacterial meningitis with sepsis," "acute respiratory failure," "Bacteremia," "Staph Uti," "Hep C," "Ivdu," and "Retropharyngeal abscess possible." (ECF No. 33, p. 5). Next, Plaintiff bracketed another set of notes from July 16th which included an "Assessment" as: "Bacterial meningitis," "Sepsis," "Acute metabolic encephalopathy," "Acute hypoxic respiratory failure," "Hyponatremia likely due to SIADH from meningitis," "IV drug user," and "Hepatitis C." Then under "Plan" an extensive list of planned treatment and test are listed. *Id.* at 8. Plaintiff bracketed the assessment by the physical therapist on July 17, 2022. *Id.* at 9. Plaintiff underlined in these assessment notes: "Orientation: sedated and on vent." *Id.* On this same page Plaintiff also bracketed notes from Dr. Masnoor Alam which discuss a "possible retropharyngeal collection noted on MRI brain" which Dr. Alam ordered additional testing to determine. *Id.*

The next portion of medical records Plaintiff bracketed is the blood panel drug screening. Plaintiff noted in margins: "No Drug use." *Id* at 10. The lab work listed did show Plaintiff negative on July 16, 2019 for Cannabiniods, PCP, Methamphetamine, Opiate, amphetamine, benxodiazepine, tricyclics, methadone, barbiturate, oxycodone, and propoxyphene. *Id.* On the same page, Plaintiff bracketed a section and wrote in the margins: "scarring on lungs." *Id.* The bracketed section states preliminary results from a chest x-ray: "small right greater than left pleural effusions with atelectasis, scarring or infiltrates in the lower lungs." *Id.* Plaintiff next notes: "Positive Sepsis" next to a Progress Note on July 16, 2019 by a registered nurse titled "vSepsis Surveillance Note," and then notes "Because unresponsive" next to another progress note from a registered nurse on the same day. The nurse note reads: "Pt was previously altered but now is not answering nurse. Jackson and Borat notified." *Id.* at 11. Next Plaintiff notes in the margins of

12

the admitting doctor's notes:[3] "could have been avoided if taken seriously in the 14 days before." *Id.* 12.  Plaintiff goes on to state "If I was taken seriously by nurse staff i wouldn't of almost die and not of been so bad off." *Id.*  Plaintiff again points to the negative drug screen results, and circles diagnosis from the emergency room: "Meningitis," "Delirium secondary to multiple medical problems," and "Leukocytosis unspecified type." *Id*. at 14.  The next record Plaintiff highlights are nurses notes from the emergency room on July 16, 2019.  These notes chronical Plaintiff's declining mental state from 11:50 am to 12:57 pm, as well as notations that the nurse unsuccessfully attempted to contact family, "droplet/airborne precautions" were initiated, and a lumbar puncture was ordered along with critical care.  *Id.*  Finally, Plaintiff highlights the emergency room doctors notes from July 16, 2019.[4]  *Id*. at 15.

### III. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co*., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient

---

[3] The Court quoted this doctor note in full in the Factual Background section herein.  *Intra* at 6.
[4] The Court has included this set of notes verbatim in the factual background herein.  *Intra* at 5.

evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607. "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. at 610. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Under § 1983, a defendant may be sued in either his personal capacity, or in his official capacity, or claims may be stated against a defendant in both his personal and his official capacities. The type of conduct that is actionable and the type of defense available depend on whether the claim is asserted against a defendant in his official or individual capacity. *See Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (internal citations omitted). "Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself." *Id.* Personal capacity claims "are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense" to these individual capacity claims. *Id.* To state a claim under 42 U.S.C. § 1983, Plaintiff must allege that the defendant acted under color of state law, and that the actor violated a right, privilege, or immunity secured by the Constitution. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).

## IV. DISCUSSION

Plaintiff claims that all three of the Defendants violated his constitutional rights by denying him proper medical treatment. Specifically, Plaintiff clarified through his deposition testimony

that Defendant Foster violated his constitutional rights by comments Foster made on July 11, 2019, during a nurse call. (ECF No. 7, p 10).  Plaintiff testified that Nurse Defendants Prince and Stephens violated his constitutional rights by their negligent medical malpractice regarding his assessments and treatments. (ECF Nos. 1, p. 4-5; 19-3, p. 14-16).

As noted above, in July 2019, Plaintiff was a pretrial detainee.  Historically, cases in the Eighth Circuit have analyzed denial of medical claims brought by arrestees and pretrial detainees under the Due Process Clause of the Fourteenth Amendment.  *See e.g., Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012).  While the Eighth Circuit has indicated it is an open issue in this circuit whether the claims of arrestees should be analyzed under the Fourth Amendment's objective reasonableness standard rather than the Due Process Clause of the Fourteenth Amendment, courts in this circuit have continued to analyze Fourteenth Amendment Due Process medical care claims under the deliberate indifference standard of the Eighth Amendment.  *See e.g., Morris v. Cradduck*, 954 F.3d 1055, 1058 (8th Cir. 2020) (pretrial detainee has the same rights to medical care under the Due Process Clause as an inmate has under the Eighth Amendment).  The Court therefore examines Plaintiff's claims under the Eighth Amendment's deliberate indifference standard.  *Id*.

To succeed on this type of claim, Plaintiff must demonstrate (1) that he had an objectively serious medical need, and (2) that the Defendants actually knew of, but deliberately disregarded, that serious medical need.  *See Ivey v. Audrain Cnty., Mo.*, 968 F.3d 845, 848 (8th Cir. 2020).  "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (cleaned up).  "To demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the

[detainee's] health." *Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018) (cleaned up). The Eighth Circuit has stated that this "onerous standard requires a showing more than negligence, more than even gross negligence, but less than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." *Thompson v. King*, 730 F.3d 742, 747 (8th Cir. 2013) (cleaned up).

Deliberate indifference may also be manifested by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104–05 (1976). However, the "Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. County of Hennepin, Minn.,* 557 F.3d 628, 633 (8th Cir. 2009). "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that these delays adversely affected his prognosis[,]" *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (cleaned up), unless the need for medical attention is obvious to a layperson, in which case the plaintiff need not submit verifying medical evidence to show the detrimental effects of delay. *See Schaub v. VonWald,* 638 F.3d 905, 919 (8th Cir. 2011) (citing *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999)); *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) (holding a three week delay, "coupled with knowledge of inmate-patient's suffering, can support a finding of an Eighth Amendment violation").

**A. Defendant Foster's Motion for Summary Judgment**

Defendant Foster has asserted he is entitled to qualified immunity from Plaintiff's claims. Qualified immunity "shields [a] government official from liability in a section 1983 action unless the official's conduct violates a clearly established right of which a reasonable person would have known." *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009). Qualified immunity

protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs,* 475 U.S. 335, 341 (1986).  "At summary judgment, qualified immunity shields a law enforcement officer from liability in a § 1983 action unless: (1) the facts viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation."  *Watson v. Boyd,* 2 F.4th 1106, 1109 (8th Cir. 2021) (cleaned up).  The Court will begin with determining whether there are any genuine issues of material fact regarding Plaintiff's claim of denial of medical care against Defendant Foster.

Facts in the record related to Plaintiff's claim against Defendant Foster are disputed. Specifically, Plaintiff alleges Defendant Foster made comments on July 11, 2019 during a nurse assessment that negatively influenced the nurses and medical staff at the BCDC.  Plaintiff argues that, without Defendant Foster's negative comments, Plaintiff's meningitis would have been discovered sooner.  Plaintiff alleges Foster (along with the Nurse Defendants) accused him of "lying" when he made complaints of pain and sent him back to his pod.  (ECF No. 1, pp. 4-5). During his deposition, Plaintiff was asked to clarify how he believed Defendant Foster denied him medical care.  Plaintiff explained that Defendant Foster was present during one of Plaintiff's visits with one of the nurses.  During this visit, Plaintiff explained Defendant Foster "put his comments in, and I believe that the nurse listened to him more than she listened to me and failed to do her job and listen to me and my symptoms."  (ECF No. 18-7, p 10).  Plaintiff claims Defendant Foster stated "[Plaintiff's] just wanting to get out of his cell and come down here and talk; nothing wrong with him."  *Id.*  Plaintiff claims the Nurse then said: "I believe so, too . . ."  *Id.*  Plaintiff is alleging that Defendant Foster's comments caused him to be treated differently by the nurses.  *Id.*  Plaintiff alleges this interaction occurred during the visit from Defendant Prince on July 11, 2019.  *Id.*

17

The medical records from Plaintiff's jail file indicate Nurse Prince never evaluated Plaintiff; to the contrary, it was Nurse Nadia Malapha and later, Nurse Francesca Kriegbaum, who evaluated Plaintiff on two separate occasions on July 11, 2019. (ECF No. 18-4, p. 10). Plaintiff does not dispute these records in either his Response or Supplement. (ECF Nos. 23, 33). Defendant Foster submitted a Shift Log which he contends reflects he was not on shift on July 11, 2019; (ECF No. 18-6); however, Defendant Foster never argues he did not make the alleged statements. The Court finds it irrelevant to Defendant Foster's Motion for Summary Judgment which nurse assessed Plaintiff during the July 11, 2019 nursing visits. Further, for the purposes of this summary judgment analysis, the Court will consider the disputed facts in a light most favorable to Plaintiff. *See Watson*, 2 F.4th at 1109.

The additional undisputed facts related to Plaintiff's claim against Defendant Foster establish Plaintiff was evaluated by medical staff at the BCDC on July 6, twice on July 11 and twice on July 12, 2019. (ECF No. 18-4). There are no medical requests or grievances produced by either party for the period of July 3 through July 16, 2019. Plaintiff's medical jail file does chronical each of the above enumerated encounters. Plaintiff complained of rib pain on July 6th and was prescribed Naproxen.[5] *Id.* at 1. On July 11, Plaintiff's complaint was severe pain all over his body at his first nurse visit, and a 10/10 level of pain on the second nurse visit. Plaintiff was put on the doctor visit list for the next day, and was started on an opioid withdrawal protocol, consisting of multiple medications to treat withdrawal symptoms. *Id.* at 4-6, 10. On July 12, Plaintiff was examined by a nurse at 2:33 a.m. when he complained of the worst pain of his life;

---

[5] Plaintiff does dispute the level of pain recorded by the nurse from this visit, however, the Court does not find his level of pain on July 6, 2019 to be a material fact as this pain and nurse visit appears to be unrelated to Plaintiff's medical condition at issue here—meningitis.

the nurse noted no visual abnormalities on Plaintiff's neck or back, provided Plaintiff Tylenol, and stated he could see the doctor later that day. *Id.* On July 12, Plaintiff's chief complaint to Dr. Raez,[6] was pain from the top of his head down to his back. Dr. Raez noted Plaintiff's chest pain was atypical and ordered chest x-rays, lab work, and prescribed him Prednisone and Tylenol. *Id.* at 2. On July 15, 2019, Plaintiff began hallucinating and had blood work drawn for the lab work ordered by Dr. Raez. *Id.* at 9. Plaintiff was ordered to the emergency room on the morning of July 16, the same day Plaintiff's lab work was returned to Dr. Raez and had abnormal results. *Id.* at 10.

### 1. Individual Capacity of Defendant Foster

As explained above, there is a subjective and objective element to Plaintiff's claim that Defendant Foster was deliberately indifferent to his medical needs. *Dulany v. Carnahan,* 132 F. 3d 1234, 1239 (8th Cir. 1997). Plaintiff must demonstrate (1) that he had an objectively serious medical need, and (2) that Defendant Foster actually knew of, but deliberately disregarded, that serious medical need. *See Ivey*, 968 F.3d at 848. In the context of a prison guard, deliberate indifference can be demonstrated by a guard who intentionally denies or delays access to medical care or intentionally interferes with prescribed treatment. *Dulany*, 132 F.3d at 1239. Even considering the facts in the light most favorable to Plaintiff, the record does not establish Defendant Foster knew of a serious medical need of Plaintiff's, or that Defendant Foster intentionally denied, delayed, or interfered with Plaintiff's medical care.

While the Court acknowledges Plaintiff was very sick, and unfortunately suffered serious complications from the illness of bacterial meningitis, the question before it is whether Plaintiff

---

[6] Dr. Raez is a non-party physician employed by Turn Key that provides medical services to the BCDC. (ECF No. 19-6).

suffered an "objectively serious medical need" while incarcerated at the BCDC during the time at issue here. *Ivey*, 968 F.3d at 848. At this stage, to survive summary judgement, Plaintiff must point to facts in the record that could support a jury finding that a doctor had diagnosed him as needing treatment, or his symptoms were so obvious that even a lay person could recognize the need for medical treatment. *Coleman,* 114 F.3d at 784. Plaintiff's chief (and only) complaint prior to July 11, 2019, was one of pain. Plaintiff does not dispute the fact he never exhibited any visible signs or symptoms, other than the hallucinations beginning on July 15, and the abnormal lab results on July 16, both of which arose after Defendant Foster's actions/comments to the Nurse. It is unclear whether, at the time of Defendant Foster's comments, if Dr. Raez had prescribed the opioid withdrawal protocol.[7] However, it is clear from the record that, on July 11, 2019, Plaintiff was under the care of the medical professionals at the BCDC for his complaints of pain, and they had not yet determined he needed additional treatment and/or emergency room care. Accordingly, based on those undisputed facts, the Court determines Plaintiff did not suffer from an objectively serious medical need on July 11, 2019, beyond the pain for which he was being treated with medication. *Holden,* 663 F.3d at 342 (holding dental pain with no outward symptoms such as swelling or bleeding did not constitute an objectively serious medical need). Even the medical professionals assessing Plaintiff did not, at that time, believe he required care beyond what he was already receiving. Furthermore, Defendant Foster – who is not a medical professional – is entitled to rely upon the opinion and diagnosis of medical professionals at the BCDC. *Id.* at 343

---

[7] Dr. Raez prescribed the opioid withdrawal protocol on July 11, 2019 and Defendant Foster's comments were during one of Plaintiff's nurse visits on July 11, 2019. The record is unclear which occurred first in time.

(explaining the officer's reliance on a nurse's examination and conclusion that the inmate did not require further dental care was reasonable).

Even if the Court assumed, *arguendo,* that Plaintiff suffered from an objectively serious medical need based on his eventual diagnosis of bacterial meningitis, the record before the Court – viewed in the light most favorable to Plaintiff – does not demonstrate the subjective prong of the analysis, i.e., that Defendant Foster actually knew of Plaintiff's serious medical need and deliberately disregarded it. To proceed, Plaintiff must establish that Defendant Foster knew the risk his comments would pose to Plaintiff and deliberately disregarded that risk. *See Thompson,* 730 F.3d at 747. Here, Plaintiff's complaint is that Defendant Foster told the nurse that Plaintiff was lying and faking his complaints of pain. There is no evidence in the record to show Defendant Foster did not believe his own statements. Plaintiff fails to assert Defendant Foster did not, in fact, believe Plaintiff to be faking his symptoms but still advised the Nurse that Plaintiff was faking. Thus, Defendant Foster could not have deliberately disregarded a known risk to Plaintiff if he did not believe there was any risk because of Foster's belief that Plaintiff was "faking" his symptoms. Moreover, while Defendant Foster may have believed Plaintiff was "faking" when making the careless statement, Foster did not ignore Plaintiff's complaints or deny him access to medical care as is obvious from the multiple nursing visits Plaintiff received on July 11, 2019.

Finally, liability under Section 1983 "requires a causal link to, and direct responsibility for, the deprivation of rights." *Madewell v. Roberts,* 909 F.2d 1203, 1208 (8th Cir. 1990). There are no facts in the record illustrating that Defendant Foster's comments caused any denial or delay of medical care to Plaintiff. To the contrary, it is undisputed that the very same day as Defendant Foster's comments – July 11, 2019 – Plaintiff was evaluated by a nurse at least twice, received medication, and was scheduled a doctor's appointment for the following day. He was then seen

and evaluated by Dr. Raez as scheduled, who ordered the testing that resulted in Plaintiff's ultimate transfer to the emergency room.  If anything, the record indicates the nurse assessments on July 11, 2019, were the turning point for Plaintiff, whose treatment and testing were increased/elevated by the medical staff at the BCDC.  Without facts indicating that Defendant Foster's actions caused some sort of interference, delay, or denial of Plaintiff's medical care, the Court concludes there is no genuine issue of material fact as to whether Defendant Foster exhibited deliberate indifference to Plaintiff's serious medical needs.

Having found the facts, viewed in the light most favorable to Plaintiff, do not rise to the level of a constitutional violation, Defendant Foster is entitled to qualified immunity on Plaintiff's denial of medical care claim. *See e.g., Krout v. Goemmer,* 583 F.3d 557, 570 (8th Cir. 2009) (holding the evidence insufficient to demonstrate deliberate indifference to detainees medical care, therefore, the officers were entitled to qualified immunity without an analysis of whether the detainees rights were clearly established).

## 2.  Official Capacity Claim against Defendant Foster

Plaintiff's official capacity claim against Defendant Foster is essentially a claim against Benton County. *White v. Jackson,* 865 F.3d 1064, 1075 (8th Cir. 2017).  A governmental authority will not be held liable for the actions of its employees or agent on a *respondeat superior* theory of liability.  *Monell v. New York Dep't. of Soc. Servs.,* 436 U.S. 658, 694 (1978).  "Section 1983 liability for a constitutional violation may attach to a [county] if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise."  *See Corwin v. City of Independence, Mo.,* 829 F.3d 695, 699 (8th Cir. 2016) (internal quotations and citations omitted)*.*  Plaintiff must be able to show genuine issues of material fact as to whether Defendant Foster took an action pursuant to an unconstitutional policy

or custom . . . or that he possessed final authority over the subject matter at issue and used that authority in an unconstitutional manner. *Nix v. Norman,* 879 F.2d 429, 433 (8th Cir. 1989). Without a constitutional violation by Defendant Foster, there can be no official capacity claim against Benton County based on the same actions. *See Morris v. Cradduck,* 954 F.3d 1055, 1060 (8th Cir. 2020); *Sanders v. City of Minneapolis, Minn.,* 474 F.3d 523, 527 (8th Cir. 2007) (citing *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986)).

In his Complaint, Plaintiff does not identify any policy, or unofficial custom of Benton County, or any deliberately indifferent failure to train or supervise by Benton County which he alleges caused the denial of medical care independent of Defendant Foster's alleged actions. When asked to explain his official capacity claim against Benton County during his deposition, Plaintiff was somewhat confused by defense counsel's questions. After several reiterations of the question Plaintiff ultimately testified as follows:

> Q:    And you're not claiming that there was a policy, whether written or not, that directly - -
>
> A:    I'm not. No, no, no, no, no. See, that's where you're confusing me. I'm only going off of me and what happened to me.
>
> Q:    Okay. All right.
>
> A:    That's all I can do.
>
> Q:    So, there's not a policy that you think that they followed and caused this violation; you think they didn't follow policy, and there's not a ---
>
> A:    Exactly.
>
> Q:    -- and there's not a widespread practice that you're aware of, correct?
>
> A:    I don't know. All I know is what happened to me and my experience.
>
> Q:    Okay. So you don't know of a widespread practice where this has happened more than what you experienced, correct?

A:      I don't know.

Q:      Okay. So, you're claiming –

A:      I don't know, and I don't care.

Q:      All right.

A:      Like, I just know what's going on with me.

Q:      Fair enough.  So –

A:      Sorry.

Q:      -- your claim against Deputy Foster is based on the one time that he was present with a nurse or nurses where he said that you were just wanting to get out of your cell and come here and talk?

A: (Nods Head.) Yes.
…
Q:      Is there anything else about your claim against Deputy Foster that you want to tell me?

A:  I believe my main complaint is that he should have stayed with his own job instead of giving advice to a medical profession [sic] that he doesn't know anything about, that could have stopped me from receiving the treatment, that could have gotten me to a doctor sooner, that could have helped me instead of hurt me.

(ECF No. 18-7, p. 12).  In his response to Defendant Foster's Motion for Summary judgment, Plaintiff identifies a dispute about Benton County Policy G13, arguing this policy was not followed because he did not receive a "qualified person" to do anything for him in timely manner.  (ECF No. 23, pp.3-4). Because Plaintiff does not identify any policy, or unofficial custom of Benton County which resulted in a constitutional violation, or a deliberately indifferent failure to train or supervise on the part of Benton County, identifying a policy which was allegedly not followed is insufficient. Accordingly, Plaintiff has failed to state a cognizable official capacity claim against Benton County.

**B.     Defendants Stephens and Prince's Joint Motion for Summary Judgment**

Plaintiff claims that Nurse Defendants Stephens and Prince violated his constitutional rights by denying and/or delaying his medical care.  Plaintiff's claims against the Nurse Defendants are substantially similar to the one alleged against Defendant Foster.  Plaintiff claims the Nurse Defendants accused him of lying regarding his symptoms and sent him back to his pod.  The Nurse Defendants also allegedly delayed Plaintiff's medical care until it was almost too late.  Finally, the Nurse Defendants' inexperience and negligence almost killed Plaintiff.  (ECF No. 1, pp 4-5).  In his deposition, Plaintiff reiterated his claims of negligence and malpractice against both Nurse Defendants.  (ECF No. 19-3, p. 14-16).

**1.  Individual Capacity Claims**

The Nurse Defendants contend they did not participate in any of the conduct of which Plaintiff complains.  The Court observes that Plaintiff's jail medical file of record indicates these Nurses did not participate in his assessments or nurse call visits.  Neither of the Nurse Defendants recorded a personal evaluation or medical assessment of Plaintiff during any time at issue here. (ECF No. 19-1).  According to Plaintiff's jail medical file, Defendant Stephens' only involvement in Plaintiff's care was to provide his Naproxen to him on July 10, 2019; enter change notes on an appointment for Plaintiff with the doctor on July 12, 2019; record a new prescription of Tylenol and Prednisone as ordered by the doctor on July 12, 2019; draw his blood on July 15, 2019; and report the abnormal results to Dr. Saez on July 16, 2019.  (ECF No. 19-1, pp. 5-6, 17-19, 32). Defendant Prince's only involvement with Plaintiff's care was to administer his prescribed medications to him on four different occasions (July 8, July 9, July 15, and July 16, 2019), and check in his medications to the internal system when it arrived from the pharmacy.  *Id*. at 14, 32-34.  Accordingly, the Nurse Defendants argue Plaintiff cannot prove the subjective element of

deliberate indifference since they were not personally involved in the actions of which he complains – calling him a liar, sending him back to his pod, not allowing him to see the doctor, delaying his treatment, and inexperience causing negligence and medical malpractice.

The Court agrees Plaintiff has named improper medical defendants in this matter.  All the actions about which Plaintiff complains in his complaint and during his deposition, occurred on days when non-party nurses evaluated, assessed, and treated Plaintiff.  Because Plaintiff was provided with his jail medical file on May 23, 2022, (ECF No. 15), this discovery production should have put Plaintiff on notice that individuals who are not parties to his lawsuit provided all of the contested treatment.  Plaintiff had sufficient time after he received his jail medical file to amend his Complaint to add the non-party treating nurses, but he did not do so.  (ECF No. 14). Furthermore, Plaintiff did not dispute the Nurse Defendants' assertions that they did not personally participate in the care which forms the basis for Plaintiff's lawsuit.  (ECF No. 23, 33).

While the Court will construe Plaintiff's pleadings liberally, *pro se* litigants are not excused from failing to comply with substantive and procedural law.  *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984).  To prove a claim against the Nurse Defendants, Plaintiff must establish that each Nurse "personally violated [his] constitutional rights." *Jackson v. Nixon,* 747 F.3d 537, 543 (8th Cir. 2014).  Liability under Section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006).  Plaintiff has not provided any evidence on the record, or even argued that these are the actual nurses who are responsible for the actions/inactions about which he complains.  Accordingly, Plaintiff's claims against the Nurse Defendants fail as a matter of law.

**2. Official Capacity Claims**

The Nurse Defendants are employees of Turn Key, the company who contracted to provide medical services to Benton County. Thus, the official capacity claim against the Nurse Defendants is essentially a claim against Turn Key. *See Johnson v. Hamilton,* 452 F.3d 967, 973 (8th Cir. 2006). "Section 1983 liability for a constitutional violation may attach to a [county or its medical provider] if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *See Corwin v. City of Independence, Mo.,* 829 F.3d 695, 699 (8th Cir. 2016) (internal quotations and citations omitted). Plaintiff must be able to show genuine issues of material fact as to whether the Nurses took an action pursuant to an unconstitutional policy or custom of Turn Key . . . or that they possessed final authority over the subject matter at issue and used that authority in an unconstitutional manner. *Nix v. Norman,* 879 F.2d 429, 433 (8th Cir. 1989).

Here, Plaintiff's only claim that could be construed as a challenge to Turn Key's policies, customs, or actions is Plaintiff's claim that the inexperience of the Nurse Defendants led to his claimed negligence/medical malpractice. The Court could interpret this as a failure to train claim. However, without a constitutional violation by the individual employee, there can be no official capacity claim against the employer. *Morris v. Cradduck,* 954 F.3d 1055, 1060 (8th Cir. 2020) *Sanders v. City of Minneapolis, Minn.,* 474 F.3d 523, 527 (8th Cir. 2007) (citing *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986)). If the Nurse Defendants' alleged negligence, malpractice, or inexperience did not violate Plaintiff's constitutional rights, then Turn Key cannot be held liable under an official capacity claim. *Id.*

As the Court explained above, Plaintiff has failed to state a cognizable claim against the Nurse Defendants because they are not the actors of the actions/inactions about which Plaintiff

27

complains.  Moreover, assuming *arguendo*, for purposes of the official capacity claim against Turn Key, that Plaintiff had named the proper medical defendants, a negligent misdiagnosis is not a valid claim under Section 1983.  Therefore, any official capacity claim against Turn Key would still fail.  The Supreme Court has explained:

> [A] complaint that a physician has been negligent in diagnosis or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle v. Gamble* , 429 U.S. 97, 106 (1976).  *See also Popoalii v. Corr. Med. Servs.,* 512 F.3d 488, 499 (8th Cir. 2008) ("Medical malpractice alone . . . is not actionable under the Eighth Amendment.").  Plaintiff (and the record) has been clear that his claims are for negligence and malpractice by the Nurse Defendants.  Plaintiff was provided opportunities to clarify his claims during his deposition and in response to Defendants' Motions for Summary Judgment but failed to utilize either of these opportunities to develop his claim into one that could be construed as deliberate indifference.  For example, the record contains an undisputed affidavit of Dr. Raez, the nonparty doctor who treated Plaintiff at the BCDC.  Dr. Raez avers that he never believed Plaintiff to be suffering from anything other than opioid withdrawals until July 16, 2019, when he sent Plaintiff for evaluation at the emergency room.  (ECF No. 19-6, p. 4).  Dr. Raez testifies that all of Plaintiff's symptoms were consistent with opioid withdrawal while symptoms of meningitis include painful stiff neck with limited range of motion, headaches, high fever, confusion or lethargy, rash, vomiting, and light sensitivity. *Id*. at 2. Dr. Raez explained that "opiate withdrawal symptoms can be the same as those for meningitis, and based on [Plaintiff's] self-reported medical history it was reasonable to suspect opioid withdrawals in the absence of a fever, rash, abnormal

vital signs, or abnormal lab results." *Id.*   Although Plaintiff challenges that he was not suffering from opioid withdrawals, the legal issue is whether the medical staff at the BCDC believed Plaintiff was suffering from opioid withdrawals, and whether that belief was reasonable under the circumstances. *See McRaven,* 577 F.3d at 983.

Jail doctors or prison officials can be "found free from liability if they responded reasonably to a risk, even if the harm ultimately was not averted." *Id.* at 1240 (quoting *Farmer v. Brennan,* 511 U.S. 825, 844 (1994); *see also Allard v. Baldwin,* 779 F.3d 768, 772-3 (8th Cir. 2015) (holding the prison medical staff's misdiagnosis of prisoner as constipated when he suffered from a bowel obstruction, which perforated and required a colotomy bag, did not rise to a constitutional violation when prisoner was adequately treated for constipation and the constipation diagnosis was supported by the reasonable standard of care); *Popoalii v. Correctional Medical Services*, 512 F.3d 488 (8th Cir. 2008) (holding the plaintiff had not presented evidence that defendant, prison medical staff, was more than grossly negligent in failing to diagnose her cryptococcal meningitis even though the plaintiff suffered from severe headaches, back pain, and blindness before she was properly diagnosed); *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (holding mere negligence or medical malpractice are insufficient to rise to a constitutional violation and a plaintiff cannot create issues of fact by stating they did not feel like they received adequate treatment when the record contains medical records indicating treatment was provided and physician affidavits indicating the care provided was adequate). While Plaintiff alleges negligence and medical malpractice, Plaintiff has failed to point to facts which support a claim of deliberate indifference by any medical staff of Turn Key, and thus, Plaintiff's official capacity claim against the Nurse Defendants must be dismissed. *Sanders,* 474 F.3d at 527.

## V. CONCLUSION

For the reasons stated above, the undersigned recommends as follows:

- Defendant C. Foster's Motion for Summary Judgment (ECF No. 16) be **GRANTED** and the individual and official capacity claims against Foster be **DISMISSED WITH PREJUDICE**; and

- Defendants Jesse Prince and Shawana Stephens' Joint Motion for Summary Judgment (ECF No. 19) be **GRANTED** and the individual and official capacity claims against Prince and Stephens be **DISMISSED WITH PREJDUICE.**

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 10th day of February 2023.

*Christy Comstock*

CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE